## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| REBECCA LYNN REYES, individually and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE PROCTER & GAMBLE COMPANY and WALMART INC.<br><br>Defendants. | No.  1:23-cv-623<br><br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Rebecca Lynn Reyes ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendants The Procter & Gamble Company ("P&G") and Walmart Inc. ("Walmart") (collectively, "Defendants"). Plaintiff makes the following allegations upon information and belief, the investigation of her counsel, and personal knowledge or facts that are a matter of public record.

### INTRODUCTION

1.      By this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals who purchased over-the-counter nasal decongestant products containing phenylephrine ("PE") developed, marketed, distributed, sold and/or manufactured by Defendants.

2.      Defendants' PE products include, but are not limited to:

- DayQuil Cold & Flu (P&G)

- DayQuil Honey Cold & Flu (P&G)

- DayQuil/NyQuil Honey Cold & Flu Co-Pack (P&G)

1

- DayQuil Severe Cold & Flu (P&G)

- DayQuil/NyQuil Severe Cold & Flu Co-Pack (P&G)

- DayQuil VapoCool Severe Maximum Strength Cold & Flu + Congestion (P&G)

- DayQuil/NyQuil VapoCool Severe Maximum Strength Cold & Flu + Congestion Co-Pack (P&G)

- DayQuil Cough DM+ Congestion Maximum Strength Daytime (P&G)

- DayQuil/NyQuil Hot Remedy Cold & Flu Relief Hot Drink Powder (P&G)

- DayQuil/NyQuil Ultra Concentrated Cold & Flu (P&G)

- DayQuil Kids Honey Cold & Cough + Mucus (P&G)

- DayQuil Sever and Super C Energize and Replenish Convenience Pack (P&G)

- Equate Daytime Severe Cold & Flu (Walmart)

- Equate Daytime Severe Sinus Congestion & Pain (Walmart)

- Equate Daytime/Nighttime Cold & Flu Multi-Symptom Relief Combo Pack (Walmart)

- Equate Daytime/Nighttime Cold & Flu Formula Multi-Symptom Combo Pack (Walmart)

- Equate Daytime/Nighttime Cold & Flu Liquid Combo Pack (Walmart)

- Equate Sinus Congestion PE (Walmart)

- Equate Effervescent Cold Relief (contains Phenylephrine Bitartrate) (Walmart)

- Equate Severe Allergy Plus Sinus Headache (Walmart)

- Equate Nighttime Flu & Severe Cold & Cough (Walmart)

- Equate Daytime Cold & Flu Liquid (Walmart)

- Equate Sinus & Allergy Suphedrine PE (Walmart)

2

- Equate Severe Congestion & Cough Liquid (Walmart)

- Equate Severe Cold & Flu (Walmart)

- Equate Day & Night Sinus Relief (Walmart)

- Equate Day Severe Cold and Nighttime Cold & Flu (Walmart)

- Equate Daytime Vapor Ice Severe Cold & Flu (Walmart)

- Equate Daytime Vapor Ice Severe Cold & Flu Liquid (Walmart)

- Equate Daytime Cold & Flu Multi-Symptom Relief (Walmart)

- Equate Daytime Severe Cold Multi-Symptom, Green Tea and Honey (Walmart)

- Equate Daytime Cold and Nighttime Cold & Cough (Walmart)

- Equate Daytime/Nighttime Mucus Relief Cold & Flu (Walmart)

- Equate Children's Cold & Cough (Walmart)

- Equate Cold, Flu & Sore Throat Multi Symptom Liquid (Walmart)

- Equate Severe Congestion Relief (Walmart)

Collectively, these products and Defendants' other PE products are referred hereafter as the "Products."

3. Defendants market these Products as providing nasal decongestant relief and attribute the Products' ability to provide nasal decongestant relief to the inclusion of one active ingredient: PE.

4. Plaintiff and the Class reviewed and relied on this marketing when purchasing Defendants' products including PE.

5. On September 11 and 12, 2023, an advisory committee to the U.S. Food & Drug Administration ("FDA") unanimously agreed that PE, when taken orally, is not effective at

relieving oral congestion. However, neither the FDA nor the advisory committee identified any safety issues with use of PE when taken orally at the recommended dose.

6.      Defendants knew and/or had reason to know, at all times material to Plaintiff's claims, that their Products were no more effective than placebo. Accordingly, Defendants' misrepresentations regarding the Products are false, misleading, and likely to deceive the public.

7.      Had Plaintiff and the Class known that these Products were ineffective as nasal decongestants when taken orally, they would not have purchased them or would have paid substantially less for them.

8.      Accordingly, Plaintiff, on behalf of herself and those similarly situated, seeks to hold Defendants accountable for their deception, misrepresentation, omissions, and breach of their obligations under applicable state and federal consumer protection laws.

**PARTIES**

**Plaintiff Reyes**

9.      Plaintiff Rebecca Lynn Reyes ("Plaintiff") is a resident of Garfield County, Oklahoma.

10.     Plaintiff purchased Defendants' Products, including but not limited to NyQuil Severe Cold & Flu (P&G) and Equate Daytime Cold & Flu Multi-Symptom Relief (Walmart) during the Class Period.

11.     Plaintiff purchased Defendants' Products for many years to treat colds and provide relief from congestion. When making these purchases, Plaintiff relied on Defendants' marketing that Defendants' Products would be effective in providing relief from congestion.

12.     None of these orally ingested Products was effective in relieving nasal congestion. Had Defendants disclosed that phenylephrine is not effective in relieving nasal congestion,

Plaintiff Reyes would not have purchased the products to orally remedy her nasal congestion or would have paid significantly less for them.

**Defendants**

13.     The Proctor & Gamble Company ("P&G") is an Ohio corporation with its principal place of business in Cincinnati, Ohio. At all times material to Plaintiff's claims, P&G has been engaged in the manufacturing, marketing, sale and distribution of misbranded and ineffective phenylephrine products, including but not limited to, DayQuil Cold & Flu, DayQuil Severe Cold & Flu, NyQuil Severe Cold & Flu throughout the United States.

14.     Walmart Inc. is a Delaware Corporation with its headquarters in Bentonville, Arkansas. At all times material to Plaintiff's claims, Walmart has been engaged in the manufacturing, marketing, sale and distribution of misbranded and ineffective phenylephrine products, including but not limited to, Equate Daytime Cold & Flu Multi-Symptom Relief, Equate Suphedrine PE, Equate Children's Cold & Cough throughout the United States.

**JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1711, et seq., because at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

16.     The Court has personal jurisdiction over this action because each Defendant conducts substantial business in this District, such that Defendants have significant, continuous, and pervasive contacts with the State of Ohio. As such, Defendants have purposefully availed themselves of the laws and benefits of doing business in this District such that they could

5

reasonably foresee litigation being brought in this District. Each of the Defendants markets and distributes its products in Ohio.

17.     The Court additionally and independently has personal jurisdiction over Defendant P&G because it operates from headquarters in Cincinnati, Ohio.

18.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because Defendants transact business within this District including marketing and selling Products.

**FACTUAL ALLEGATIONS**

**A.     Over-the-Counter Oral Decongestants**

19.     The market for nasal decongestants sees tens of billions of dollars in annual sales.[1] PE is the listed active ingredient in at least 250 orally administered nasal decongestants. PE comes in two varieties, phenylephrine hydrochloride ("PEH") and phenylephrine bitartrate ("BEP"). It has been used as the active ingredient in over-the-counter ("OTC") drugs for more than 75 years.

20.     Among the drugs that use PE are household staples such as Sudafed PE, Tylenol Cold & Flu Severe, Nyquil Severe Cold & Flu, Advil Sinus Congestion and Pain, and Mucinex Sinus Max. Together, these and other oral decongestants containing PE accounted for nearly $1.8 billion in sales in 2022.[2]

21.     The primary compound alternatively relied on as an active ingredient in oral decongestants is pseudoephedrine. But pseudoephedrine's use has declined over the years as

---

[1] Nasal Spray Industry Analysis, GLOBAL MARKET INSIGHTS (May 2023), https://www.gminsights.com/industry-analysis/nasal-spray-market#:~:text=Nasal%20Spray%20Market%20size%20was,6.7%25%20from%202023%20to%202032 (last visited Sept. 29, 2023); C. Jewett & R. Rabin, *A Decongestant in Cold Medicines Doesn't Work at All, an F.D.A. Panel Says*, N. Y. TIMES (Sept. 12, 2023), https://www.nytimes.com/2023/09/12/health/cold-medicine-decongestant-fda.html? (last visited Sept. 29, 2023).

[2] C. Jewett & R. Rabin, *supra* note 1.

federal law has restricted access to it.[3] Products containing pseudoephedrine are placed behind store counters or in locked cabinets, customers must be 18 or over and provide identification, and may only purchase a limited number of tablets at a time. Restrictions exist because of pseudoephedrine's role in the production of methamphetamine and were established by Congress's passage of the Combat Methamphetamine Epidemic Act of 2005.[4]

22.     Pseudoephedrine's decline has led to PE's rise. Aiming to avoid reduced sales because of pseudoephedrine restrictions and develop OTC alternatives, drug manufacturers turned to PE. By 2022, pseudoephedrine accounted for only around 20% of the oral nasal decongestant market while PE constituted closer to 80%.[5]

**B.      PE's Efficacy**

23.     But as drug manufactures turned their focus on marketing products containing PE, they ignored evidence that it is ineffective when taken orally.[6]

24.     PE is a vasoconstrictor often administered intravenously in hospital settings to address low blood pressure resulting from vasodilation.[7] When administered intranasally through

---

[3] C. Jewett & R. Rabin, *supra* note 1.

[4] *Methamphetamine Research Report*, NIH: NATIONAL INSTITUTE ON DRUG ABUSE (October 2019), https://nida.nih.gov/publications/research-reports/methamphetamine/how-methamphetamine-manufactured (last visited Sept. 29, 2023).

[5] Matthew Perrone, *Popular nasal decongestant doesn't actually relieve congestion, FDA advisers say*, PBS NEWSHOUR (Sept. 12, 2023), https://www.pbs.org/newshour/health/popular-nasal-decongestant-doesnt-actually-relieve-congestion-fda-advisers-say#:%7E:text=WASHINGTON%20(AP)%20%E2%80%94%20The%20leading,the%20long%2Dquestioned%20drug%20ingredient (last visited Sept. 29, 2023).

[6] C. Jewett & R. Rabin, *supra* note 1.

[7] Phenylephrine StatPearl, NIH: NATIONAL LIBRARY OF MEDICINE (July 10, 2023), https://www.ncbi.nlm.nih.gov/books/NBK534801/ (last visited Sept. 29, 2023).

a spray, its vasoconstricting properties operate to reduce nasal congestion.[8] PE's decongestant effect is purportedly also present when taken orally.[9]

25.     Not every method of PE delivery is equally efficacious. Studies reaching as far back as 1933 suggested that orally administered PE does not affect blood pressure until reaching dosage levels close to or over 100 mg.[10] By contrast, intravenous application typically sees several doses of between 50 and 100 *micro*grams, one thousandth the concentration.[11]

26.     A 1976 proposed FDA rule preliminarily approved PEH's suitability as an active ingredient in orally administered nasal decongestants at only 10 mg.[12] It largely relied on a series of in-house studies submitted by representatives of pharmaceutical companies.[13] Of the remaining two studies with evaluable data, the first was taken to indicate efficacy despite demonstrating no differences between active versus placebo groups and the second, by Columbia University, indicated a lack of efficacy.[14]

27.     A comment during the rulemaking process criticized the proposal, summarized the state of unpublished studies as "split evenly between mild successes and total failures," and

---

[8] *See* Nonprescription Drugs Advisory Committee, *Efficacy of Oral Phenylephrine as a Nasal Decongestant* (Sept. 12, 2023) at 13, https://www.fda.gov/media/171915/download (last visited Sept. 29, 2023).

[9] C. Jewett & R. Rabin, *supra* note 1.

[10] Nonprescription Drugs Advisory Committee, *supra* note 8.

[11] Phenylephrine StatPearl, NIH: NATIONAL LIBRARY OF MEDICINE (July 10, 2023), https://www.ncbi.nlm.nih.gov/books/NBK534801/ (last visited Sept. 29, 2023).

[12] Establishment of a Monograph for OTC Cold, Cough, Allergy, Bronchodilator and Antiasthmatic Products, 41 F.R. 38420 (Sept. 9, 1976), https://archives.federalregister.gov/issue_slice/1976/9/9/38248-38441.pdf#page=131 (last visited Sept. 29, 2023).

[13] Ronald Eccles, *Substitution of phenylephrine for pseudoephedrine as a nasal decongestant. An illogical way to control methamphetamine abuse*, 63(1) BR. J. CLINICAL PHARMACOLOGY 10 (Jan. 2007) ), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2000711/ (last visited Sept. 29, 2023); Nonprescription Drugs Advisory Committee, *supra* note 8, at 17.

[14] Nonprescription Drugs Advisory Committee, *supra* note 8, at 18-20.

cited a published study indicating no efficacy even in high doses.[15] The advisory panel acknowledged that the data were "not strongly indicative of efficacy" but nevertheless recommended that the FDA categorize oral PEH as safe and effective.[16]

28.     Based on these data, the FDA declared PEH effective at a 10 mg dose in a tentative final monograph in 1985 and a final monograph in 1994.[17] It added PEB to the monograph in 2006, concluding it is comparable to PEH.[18]

29.     The monograph designated PE-containing products as generally recognized as safe and effective (GRASE) when taken orally at the specified dosage.[19] This status permits pharmaceutical companies such as the Defendants to market products containing GRASE ingredients directly to consumers as over-the-counter medications.

30.     However, a 2007 meta-analysis of the scientific literature concluded that insufficient evidence supported oral PE being effective as a nasal decongestant at the monographed dosage. It showed instead that PE is no more effective than a placebo.[20]

31.     Citizen petitioners relying on the meta-analysis challenged the FDA's PE approval.[21] In addition to the meta-analysis, they presented two recent placebo-controlled studies

---

[15] *See* Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use; Tentative Final Monograph for Over-the-Counter Nasal Decongestant Drug Products, 50 F.R. 2226 (Jan. 15, 1985), https://archives.federalregister.gov/issue_slice/1985/1/15/2198-2241.pdf#page=29 (last visited Sept. 29, 2023).

[16] *Id.*

[17] Nonprescription Drugs Advisory Committee, *supra* note 8, at 11-12.

[18] Amended Final Monograph, 71 F.R. 43358 (Aug. 1, 2006), https://www.govinfo.gov/content/pkg/FR-2006-08-01/pdf/E6-12265.pdf (last visited Sept. 29, 2023).

[19] Nonprescription Drugs Advisory Committee, *supra* note 8, at 18-20.

[20] R. Hatton et al., *Efficacy and safety of oral phenylephrine: systematic review and meta-analysis*, 41(3) ANN. OF PHARMOCOTHERAPY 381, https://pubmed.ncbi.nlm.nih.gov/17264159/ (last visited Sept. 29, 2023).

[21] Nonprescription Drugs Advisory Committee, *supra* note 8, at 23.

from reputable laboratories that demonstrated no benefit to PE over a placebo.[22] Both studies were published subsequently, in 2009.[23]

32.     After considering the petition, the FDA's Nonprescription Drugs Advisory Committee recommended further investigation.[24] It suggested trials to evaluate individuals' subjective symptom scores rather than using a "nasal airway resistance" score relied on in many of the studies reviewed for the initial monograph.[25] By doing so, the committee did no more than insist on established best practices.[26]

33.     By 2016, two larger studies had been conducted and published confirming that PE is ineffective when taken orally.[27] A third study, sponsored by Johnson & Johnson Consumer Inc., also indicated that PE is ineffective but was never published.[28]

---

[22] *Id.* at 28, 37.

[23] Day et al., *Efficacy of loratadine-montelukast on nasal congestion in patients with seasonal allergic rhinitis in an environmental exposure unit*, 102(4) ANN. ALLERGY ASTHMA & IMMUNOLOGY 328, https://pubmed.ncbi.nlm.nih.gov/19441605/ (last visited Sept. 29, 2023); Horak et al., *A placebo-controlled study of the nasal decongestant effect of phenylephrine and pseudoephedrine in the Vienna Challenge chamber*, 102(2) ANN. ALLERGY ASTHMA & IMMUNOLOGY 116, https://pubmed.ncbi.nlm.nih.gov/19230461/ (last visited Sept. 29, 2023).

[24] Nonprescription Drugs Advisory Committee, *supra* note 8, at 30.

[25] *Id.*

[26] *Id.* at 56.

[27] Meltzer et al., *Oral Phenylephrine HCl for Nasal Congestion in Seasonal Allergic Rhinitis: A Randomized, Open-label, Placebo-controlled Study*, 3(5) J. ALLERGY & CLINICAL IMMUNOLOGY IN PRACTICE 702 (Sept. 2015), https://pubmed.ncbi.nlm.nih.gov/26143019/ (last visited Sept. 29, 2023); Meltzer et al., *Phenylephrine hydrochloride modified-release tablets for nasal congestion: a randomized, placebo-controled trial in allergic rhinitis patients*, 116(1) ANN. OF ALLERGY ASTHMA & IMMUNOLOGY 702 (Jan. 2016), https://pubmed.ncbi.nlm.nih.gov/26560899/ (last visited Sept. 29, 2023). *See also* Nonprescription Drugs Advisory Committee, *supra* note 8, at 42-51.

[28] Randomized, Double-blind, Placebo-Controlled, Efficacy Study of a New Formulation of Phenylephrine HCL in the Common Cold, CLINICALTRIALS.GOV (June 4, 2019), https://classic.clinicaltrials.gov/ct2/show/NCT03339726 (last visited Sept. 29, 2023). *See also* Nonprescription Drugs Advisory Committee, supra note 8, at 51-54.

34.     The development of further scholarship precipitated a second citizen petition in 2015, now supported by the American Academy of Allergy, Asthma & Immunology.[29] It sought the removal of oral PE from the monograph.

35.     In 2018, while its consideration of PE was pending, the FDA released industry guidelines concerning the appropriate method by which to determine the efficacy of treatments of allergic rhinitis—congestive symptoms created by an allergic reaction.[30] Consistent with the 2007 recommendation in the PE context, it moved toward subjective symptom scores rather than suggesting use of nasal airway resistance.

36.     Meanwhile, thorough review by the FDA's clinical and clinical pharmacology teams progressed. The teams concluded in a 2023 report that clinically relevant responses to orally administered PE do not occur until doses of around 80 to 100 mg.[31] The teams also scrutinized and criticized the studies presented to the panel that originally affirmed PE's efficacy. They described these studies as "highly problematic in both design and methodology" and not meeting modern research standards.[32]

37.     Consequently, on September 11 and 12 of this year, an advisory committee to the FDA unanimously concluded that orally administered PE is ineffective to treat nasal congestion;

---

[29] Citizen's Petition, CITELINE (Nov. 4, 2015), https://pink.citeline.com/-/media/pmbi-old-site/supporting-documents/the-tan-sheet/23/45/45-citizens-petitionphenylephrinenovember-2015.pdf (last visited Sept. 29, 2023); American Academy of Allergy, Asthma & Immunology and American College of Allergy, Asthma & Immunology's Statement of Support of Citizens' Petition for Removal of Oral Phenylephrine from Over-the-Counter Status, ACAAI.ORG, https://college.acaai.org/wp-content/uploads/2022/05/oral-phenylephrine-final-statement-in-support-of-citizens-petition-05-4-22.pdf. (last visited Sept. 29, 2023).

[30] Allergic Rhinitis: Developing Drug Products for Treatment, Guidance for Industry, FDA.GOV (Sept. 2018), https://www.fda.gov/files/drugs/published/Allergic-Rhinitis--Developing-Drug-Products-for-Treatment-Guidance-for-Industry.pdf (last visited Sept. 29, 2023).

[31] Nonprescription Drugs Advisory Committee, *supra* note 8, at 31.

[32] *See also id.* at 54.

11

it is no better than a placebo.[33] Neither the FDA nor the advisory committee identified any safety issues with PE taken orally at recommended dosages. Withdrawal of PE's GRASE designation seems likely to follow.

38.     Defendants had access to all of this information. Thus, since at least 2007, the Defendants either knew or, as sophisticated drug manufacturers, should have known that the best available scientific data, gathered using the most modern research methods, demonstrate that PE is ineffective to treat nasal decongestion when taken orally. By 2016, with the addition of two more large and reliable studies and with no further studies indicating otherwise, the scientific consensus was unmistakable. By 2018, the FDA's move toward use of subjective symptom scores in its industry guidelines placed the Defendants on further notice not to rely on older studies using nasal airway resistance.

## C.     Defendants' False Advertising

39.     Defendants have to this day persisted in aggressively and misleadingly advertising PE-containing OTC orally administered nasal decongestants to consumers across the United States. Defendants have falsely presented their products as effective and thereby accrued billions of dollars in profit.

40.     For instance, online marketing for Defendant P&G's NyQuil Severe Cold & Flu *still* describes it as "provid[ing] fast, powerful, maximum-strength 9-symptom relief to treat coughing, sneezing, stuffy nose, minor body pain, sinus congestions, sinus pressure, sore throat, headache and fever."[34] Its packaging reflects this promise:

---

[33] C. Jewett & R. Rabin, *supra* note 1.

[34] Screenshots taken from NyQuil SEVERE Maximum Strength Cough, Cold & Flu Nighttime Relief LiquiCaps, VICKS.COM, https://vicks.com/en-us/shop-products/nyquil/nyquil-severe-cough-cold-and-flu-nighttime-relief-liquicaps-24ct (last visited Sept. 28, 2023).



41.     Defendant P&G sells many other NyQuil products, as well as DayQuil products, using much the same representations on its packaging, listing PE as the active ingredient relieving nasal congestion.

42.     Defendant Walmart has similarly marketed their products based on inaccurate statements of PE's efficacy. Its packaging promised relief for numerous symptoms of the common cold, including nasal congestion, and listed PE as the active ingredient addressing congestion.[35]

---

[35] Screenshots taken from Equate Daytime Non-Drowsy Cold & Flu Multi-Symptom Relief, WALMART.COM, https://www.walmart.com/ip/Equate-Cold-and-Flu-Multi-Symptom-Relief-Fever-Reducer-Throat-Remedies-Nasal-Decongestant-Gels-24-Count/606058708 (last visited Sept. 28, 2023).



43.     Regarding these and their other PE-containing products, the Defendants promised

consumers relief from nasal congestion. They advertised PE as the active ingredient that would

provide that relief. They did so through the products' labeling and in other communications and

marketing. They acted despite the state of the scientific literature and without warning consumers

that the products were ineffective for their advertised purpose.

44.     Plaintiff and the Class Members reasonably relied on the Defendants' deceptive

marketing, purchased their products, and suffered economic damages including the cost of their

purchase.

**D.** **Tolling of Applicable Statutes of Limitations**

45.     All claims in this complaint have been brought within the applicable statutes of limitations because the statutes have been tolled by operation of the discovery rule. Plaintiff and Class Members did not discover the existence of their injuries until shortly before filing this action. Nor, as unsophisticated consumers, could they have done so through the application of reasonable diligence. Instead, they reasonably relied on Defendants' representations of PE's efficacy as an orally administered nasal decongestant. Only once the FDA advisory committee released its September 2023 decision did Plaintiff and Class Members become aware of their injuries and did their claims accrue. As a result, under the discovery rule, the applicable statutes of limitations did not begin to run until the committee released its decision.

46.     The statutes of limitations applicable to this complaint's claims have also been tolled by the equitable tolling doctrine. Until recently, Plaintiff and Class Members could not by the exercise of reasonable diligence have discovered essential information bearing on their claims. Any applicable limitations are therefore tolled.

47.     Additionally, and alternatively, the statutes of limitations are tolled by application of the equitable estoppel or fraudulent concealment doctrine. Defendants, through their continuing conduct, have not only mislead consumers about PE's efficacy to induce sales but have further concealed the truth about PE through misinformation, actively preventing Plaintiff from not only discovering any injury but promptly suing even after injury is discovered. Defendants are estopped from relying on any applicable limitations period as a result.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following proposed classes (collectively referred to as "Class"):

All natural persons in the United States who purchased one or more of Defendant P&G's Products in the United States for personal or household use ("Nationwide P&G Class").

All natural persons in the United States who purchased one or more of Defendant Walmart's Products in the United States for personal or household use ("Nationwide P&G Class").

49.     In addition, the state subclasses are defined as follows:

All natural persons in the state of Oklahoma who purchased one or more of P&G's Products in the State of Oklahoma for personal or household use ("Oklahoma State P&G Subclass").

All natural persons in the state of Oklahoma who purchased one or more of Walmart's Products in the State of Oklahoma for personal or household use ("Oklahoma State Walmart Subclass").

50.     **Numerosity and Ascertainability:** The number of Class Members is so numerous that joinder of all Class Members is impracticable. Plaintiff does not know the exact size of the Class or identity of the Class Members but, upon information and belief, believes there to be at least tens of thousands of purchasers of Defendants' Products who have been damaged by Defendants' conduct as alleged herein. Class Members may also be readily identified from Defendants' records.

51.     **Commonality and Predominance:** This action involves common questions of law and fact which predominate over any question solely affecting individual Class Members. These common questions include:

•     whether Defendants' Products contained phenylephrine;

•     whether Defendants' marketing statements are false, misleading, or objectively reasonably likely to deceive;

•     whether Defendants' alleged conduct constitutes violation of the laws asserted;

- whether Defendants' alleged conduct violates public policy;

- whether Defendants engaged in false and/or misleading advertising;

- whether Defendants were unjustly enriched as a result of their labeling, marketing, advertising and/or selling of the Products;

- whether Plaintiff and Class Members are entitled to damages and/or restitution and the proper measure of that loss; and

- whether Plaintiff and Class Members are entitled to injunctive relief to prevent Defendants from continuing to market and sell Products that lack efficacy.

52.    **Typicality**: Plaintiff's claims are typical of the other Class Members' claims because all Class Members were comparably injured through Defendants' substantially uniform misconduct, as described above. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other members of the Class that she represents, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and Class Members arise from the same operative facts and are based on the same legal theories.

53.    **Adequacy**: Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Class she seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The Class's interest will be fairly and adequately protected by Plaintiff and her counsel.

54.    **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiff and other Class Members are relatively small compared to the burden and expense

that would be required to individually litigate their claims against Defendants, so it would be virtually impossible for the Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not: individualized litigation creates a potential for inconsistent or contradictory judgments, increases the delay and expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## CAUSES OF ACTION

**A.      Claims Brought on behalf of the Nationwide Class:**

### COUNT ONE — UNJUST ENRICHMENT

55.     Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

56.     Plaintiff and Class Members conferred a monetary benefit on Defendants in the form of monetary payments from purchases of Defendants' Products.

57.     As a result of Defendants' wrongful and deceptive acts alleged herein, Defendants knowingly and voluntarily accepted and retained wrongful benefits in the form of money paid by the Plaintiff and Class Members when they purchased Defendants' Products.

58.     In so doing, Defendants acted with conscious disregard for the rights of Plaintiff and Class Members.

59.     Under principles of equity and good conscience, Defendants should not be permitted to retain money belonging to Plaintiff and Class Members because Defendants engaged in wrongful and deceptive acts resulting in Plaintiff overpaying for Defendants' Products.

60. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds received by Defendants. A constructive trust should be imposed upon all unlawful and inequitable sums received by Defendants traceable to Plaintiff and the Class.

**COUNT TWO — BREACH OF IMPLIED WARRANTY OR MERCHANTABILITY**

61. Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

62. At all times relevant, all fifty States and the District of Columbia and Puerto Rico have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability and fitness for ordinary purpose.[36]

63. Defendants were at all times a "merchant" within the meaning of Article 2 of the U.C.C., as codified under applicable law with respect to the Products which were sold to Plaintiff.

64. The Products are and were "goods" within the meaning of Article 2 of the U.C.C., as codified under applicable law.

---

[36] At all times relevant all fifty States and the District of Columbia and Puerto Rico have codified and adopted the provisions of the Uniform Commercial Code: Ala. Code § 7-2-313; Alaska Stat. § 45.02.313; Ariz. Rev. Stat. Ann. § 47-2313; Ark. Code. Ann. § 4-2-313; Cal. Corn. Code § 2313; Cob. Rev. Stat. § 4-2-313; Conn. Gen. Stat Ann. § 42a-2-313; 6 Del. Code. § 2¬313; D.C. Code. § 28:2-313; Fla. Stat. Ann. § 672.313; Ga. Code. Ann. § 11-2-313; Haw. Rev. Stat § 490:2- 313; Idaho Code § 28-2-313; 810 III. Comp. Stat Ann. 5/2-313; Ind. Code Ann. § 26-1-2-313; Kan. Stat. Ann. § 84-2-313; Ky. Rev. Stat. Ann. § 355.2-313; 11 Me. Rev. Stat. Ann. § 2-313; Md. Code. Ann. § 2-313; Mass. Gen. Law Ch. 106 § 2-313; Mich. Comp. Laws Ann. § 440.2313; Minn. Stat. Ann. § 3361-313; Miss. Code Ann. § 75-2-313; Mo. Rev. Stat. § 400.2-313; Mont Code Ann. § 30-2-313; Nev. Rev. Stat. U.C.C. § 104.2313; N.H. Rev. Ann. § 382-A:2-313; NJ. Stat Ann. § 12A:2-313; N.M. Stat Ann. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat Ann. § 25-2-313; N.D. Stat. § 41-02-313; Ohio Rev. Code Ann. § 1302.26; Okla. Stat. tit. 12A § 2-313; Or. Rev. Stat. ;72.3130; 13 Pa. C.S. § 2313; P.R. Laws. Ann. Tit. 31, § 3841, et seq.; R.I. Gen. Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Stat. § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code Ann. § 2-313; Utah Code Ann. § 70A-2-313; Va. Code § 8.2¬313; Vt. Stat. Ann. 9A § 2-313; W. Va. Code § 46-2-313; Wash. Rev. Code § 62A 2-313; Wis. Stat. Ann. § 402.313; and Wyo. Stat § 34.1-2-313.

65.     Each of the Defendants was obligated to provide Plaintiff and the Class Members Products that were merchantable quality, were reasonably fit for the ordinary purpose for which they were sold and conformed to standards of trade.

66.     Defendants impliedly warranted that their Products were of merchantable quality and fit for their ordinary purpose.

67.     Defendants breached their implied warranties because their Products were not of merchantable quality and fit for their ordinary purpose.

68.     Defendants' breaches of implied warranties were a direct and proximate cause of Plaintiff's and the other Class Members damages.

## COUNT THREE — FRAUD BY OMISSION/CONCEALMENT

69.     Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

70.     Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to Plaintiff and Class Members the true nature of the effectiveness of their Products. Defendants intentionally and knowingly falsely concealed, suppressed and/or omitted material facts including as to the standard, quality or grade of their Products. These materials facts, as set forth above, were material because Plaintiff and Class Members reasonably attached importance to them when purchasing Defendants' Products.

71.     Defendants had a duty to disclose these omitted facts because they were known and/or accessible only to Defendants due to their exclusive and superior knowledge of the Products.

72.     Defendants failed to disclose these material facts with the intent to induce Plaintiff and other Class Members to purchase their Products.

73.     Plaintiff and Class Members placed trust and confidence in Defendants due to their status as merchants of healthcare related products.

74.     Plaintiff and Class Members would not have purchased Defendants' Products but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Products or would have paid less for the Products.

75.     As a result of Defendants' omissions, Plaintiff and other Class Members have suffered actual damages including, but not limited to, their lost benefit of the bargain and overpayment of purchase of the diminished intrinsic value of the Products.

76.     Defendants knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts.

77.     Defendants acted with malice, oppression, and fraud.

78.     Plaintiff and Class Members reasonably relied on Defendants' knowingly false concealment and omissions. As a direct and proximate result of Defendants' omissions and active concealment of material facts regarding the Products, Plaintiff and Class Members have suffered actual damages in an amount to be determined at trial.

**B.     Claims Brought on behalf of the Oklahoma State Subclass:**

### COUNT FOUR — VIOLATIONS OF THE OKLAHOMA CONSUMER PROTECTION ACT
### Okla. Stat. Tit. 15 § 751, *et seq.*

79.     Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

80.     Plaintiff brings this claim pursuant to the Oklahoma Consumer Protection Act, Okla. Stat. Tit. 15 § 751, *et. seq.*, individually and on behalf of the Oklahoma State Subclass who were subject to Defendants' above-described conduct.

81.     Plaintiff and Defendants are "persons" within the meaning of Okla. Stat. Tit. 15 § 752.1.

82.     At all relevant times, Defendants are and were engaged in "consumer transactions" within the meaning of Okla. Stat. Tit. 15 § 752.2.

83.     At all relevant times, Defendants' Products are and were considered "merchandise" within the meaning of Okla. Stat. Tit. 15 § 752.7.

84.     At all relevant times, Defendants are and were engaged in "advertisements" within the meaning of Okla. Stat. Tit. 15 § 752.9.

85.     At all relevant times, Defendants are and were engaged in "deceptive trade practices" within the meaning of Okla. Stat. Tit. 15 § 752.13.

86.     At all relevant times, Defendants are and were engaged in "unfair trade practices" within the meaning of Okla. Stat. Tit. 15 § 752.14.

87.     The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits numerous unlawful practices, including misleading representations, false advertisement, and false statements. Okla. Stat. Tit. 15 § 753.

88.     In the course of their businesses, Defendants violated the Oklahoma CPA. As detailed above, Defendants willfully failed to disclose the truth about the effectiveness of their Products to provide relief to sinus/nasal congestion with the intent that consumers would be induced to purchase their Products. By failing to disclose that therir Products were ineffective as to relieving sinus/nasal decongestion, Defendants engaged in one or more of the following unfair or deceptive acts as defined in Okla. Stat. Tit. 15 § 753:

A. Making a false or misleading representation, knowingly or with reason to know, that the Products have characteristics, uses, benefits, alternations and/or quantities that they do not have;

B. Representing, knowingly or with reason to know, that the Products are of a particular standard, style and/or model when they are not; and/or

C. Advertising, knowingly or with reason to know, the Products with the intent not to sell them as advertised.

89. Defendants' failure to disclose the true characteristics of the Products were material to Plaintiff and Oklahoma State Subclass members' decision to purchase the Products, as Defendants intended. Had Plaintiff and the Oklahoma State Subclass known the truth, Plaintiff and the Oklahoma State Subclass would not have purchased the Products, or—if the Products true nature had been disclosed, Plaintiff and Oklahoma State Subclass members would have paid significantly less for the Products.

90. Plaintiff and the Oklahoma State Subclass members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants failed to disclose.

91. Defendants had an ongoing duty to Plaintiff and the Oklahoma State Subclass members to refrain from unfair and deceptive practices under the Oklahoma CPA in the course of their business. Specifically, Defendants owed Plaintiff and the Oklahoma State Subclass members a duty to disclose all material facts concerning the efficacy of their Products and possessed exclusive knowledge and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

92.     Plaintiff and the Oklahoma State Subclass members reasonably relied on Defendants' knowing false and misleading statements. As a direct and proximate result of Defendants' false statements and active concealment of material facts regarding the Products, Plaintiff and Oklahoma State Subclass members have suffered actual damages in an amount to be determined at trial.

93.     Defendants' violations present a continuing risk to Plaintiff and the Oklahoma State Subclass members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

### COUNT FIVE — VIOLATIONS OF THE OKLAHOMA DECEPTIVE TRADE PRACTICES ACT
### 78 Okla. Stat. § 53, *et. seq.*

94.     Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

95.     Plaintiff brings this claim pursuant to the Oklahoma Deceptive Trade Practices Act, Okla. Stat. Tit. 78 § 53, *et. seq.*, individually and on behalf of the Oklahoma State Subclass who were subject to Defendants' above-described conduct.

96.     Plaintiff and Defendants are "persons" within the meaning of Okla. Tit. 78 § 52.8.

97.     The Oklahoma Deceptive Trade Practices Act ("Oklahoma DTPA") prohibits numerous unlawful practices, including misleading representations, false advertisement, and false statements. Okla. Stat. Tit. 78 § 53.

98.     In the course of their businesses, Defendants violated the Oklahoma DTPA. As detailed above, Defendants willfully failed to disclose the truth about the effectiveness of their Products to provide sinus/nasal congestion relief with the intent that consumers would be induced to purchase their Products. By failing to disclose that their Products were ineffective in

relieving sinus/nasal decongestion, Defendants engaged in one or more of the following unfair or deceptive acts as defined in Okla. Stat. Tit. 78 § 53:

A.    Knowingly making a false representation as to the characteristics, ingredients, uses, benefits or quantities of their Products; and/or

B.    Representing that their Products are a particular standard, quality of grade.

99.    Defendants' failure to disclose the true characteristics of the Products were material to Plaintiff and Oklahoma State Subclass members' decision to purchase the Products, as Defendants intended. Had Plaintiff and the Oklahoma State Subclass known the truth, Plaintiff and the Oklahoma State Subclass would not have purchased the Products, or—if the Products true nature had been disclosed, Plaintiff and Oklahoma State Subclass members would have paid significantly less for the Products.

100.    Plaintiff and the Oklahoma State Subclass members had no way of discerning that Defendants' representations were false and deceptive, or otherwise learning the facts that Defendants failed to disclose.

101.    Defendants had an ongoing duty to Plaintiff and the Oklahoma State Subclass members to refrain from unfair and deceptive practices under the Oklahoma DTPA in the course of their business. Specifically, Defendants owed Plaintiff and the Oklahoma State Subclass members a duty to disclose all material facts concerning the efficacy of their Products and possessed exclusive knowledge and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

102.    Plaintiff and the Oklahoma State Subclass members reasonably relied on Defendants' knowingly false and deceptive statements. As a direct and proximate result of Defendants' false statements and active concealment of material facts regarding the Products,

Plaintiff and Oklahoma State Subclass members have suffered actual damages in an amount to be determined at trial.

103.     Defendants' violations present a continuing risk to Plaintiff and the Oklahoma State Subclass members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

104.     Pursuant to Okla. Stat. Tit. 78 § 54, Plaintiff and the Oklahoma State Subclass members seek an order enjoying Defendants' deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Oklahoma DTPA.

**PRAYER FOR RELIEF**

Plaintiff, on behalf of herself and on behalf of the proposed Class and Subclass, request that the Court:

a.     Certify this case as a class action, appoint Plaintiff as a class representative, and appoint Plaintiff's Counsel as Class Counsel for Plaintiff to represent the Class and Oklahoma State Subclass;

b.     Find that Defendants have committed the violations alleged herein;

c.     Award Plaintiff and Class Members appropriate relief, including actual and statutory damages, restitution and disgorgement;

d.     Award equitable, injunctive and declaratory relief as may be appropriate;

e.     Award all costs, including experts' fees and attorneys' fees, and the costs of prosecuting this action;

f.     Award pre-judgment and post-judgment interest as prescribed by law; and

g.     Grant additional legal or equitable relief as this Court may find just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 29th day of September, 2023.

**KELLER ROHRBACK L.L.P.**

By: *s/ Derek W. Loeser*
    Derek W. Loeser *
    dloeser@kellerrohrback.com
    Cari Campen Laufenberg *
    claufenberg@kellerrohrback.com
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101-3052
    Tel.: (206) 623-1900
    Fax: (206) 623-3384

**Counsel for Plaintiff Rebecca Lynn Reyes**

  * *Motions for admission pro hac vice to follow*